IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                        Criminal No. 3:24cr1

RAQUEL RASHAD NEAL,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Defendant's MOTION TO SUPPRESS EVIDENCE (ECF No. 17) ("the MOTION"). Having reviewed the MOTION, the GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 19), and DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 20), and having heard evidence and oral argument on the MOTION, it is hereby ORDERED that the MOTION (ECF No. 17) will be denied for the reasons set forth below.

## BACKGROUND

### I.  Procedural History

On January 8, 2024, Special Agent Travis Jefferson of the Bureau of Alcohol, Tobacco, Firearms, and Explosives filed a CRIMINAL COMPLAINT (ECF No. 1) against Raquel Rashad Neal ("Neal" or "Defendant"), alleging that Neal, a convicted felon, had violated 18 U.S.C. § 922(g)(1) by possessing a firearm. Neal was

arrested on January 11, 2024 and has been detained since. ECF Nos. 10, 15. On January 9, 2024, a grand jury returned an INDICTMENT (ECF No. 4) charging Neal with one count of violating § 922(g)(1). Neal filed the MOTION on February 2, 2024, the MOTION was briefed, and the Court heard evidence and argument on March 18, 2024.

## II.  The Facts

The undisputed facts which provide the basis for resolving the MOTION are set forth below. They are drawn from testimony at the evidentiary hearing, from the AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT of ATF Special Agent Travis Jefferson ("Jefferson Affidavit"), and from a Richmond Police Officer's body-worn camera ("BWC") footage.

On November 25, 2023, at 9:23 PM, Richmond Police Officers Cooper and Novak and Detective Hartley were patrolling Mechanicsville Turnpike near the Mosby Court, Whitcomb Court, and Eastview neighborhoods of Richmond, Virginia, areas of the city which are known for substantial and frequent criminal activity that often involves the use and trafficking of illegal drugs and the use of firearms, most of which are not lawfully possessed. While on patrol, the officers came upon a black BMW parked in front of the Shop and Go convenience store located at the southeast corner of Mechanicsville Turnpike and Carver Street. The BMW was parked facing northeast, against the curb, in the right-hand lane

of two northeast-bound traffic lanes on Mechanicsville Turnpike, and very near an intersection. It was thus illegally parked. And, the BMW did not display a front license plate as is required by Virginia law. The windows were heavily tinted so that it was difficult to view the car's interior, but its engine was running and did not appear to be occupied. Jefferson Affidavit (ECF No. 1, p. 2).

Those circumstances, taken as a whole, prompted the officers to exit their car so as to investigate further. In so doing, the officers determined that the BMW displayed a temporary tag on the rear of the car, so the number of the temporary rear tag was processed using the cruiser's computer. The report on that tag came back as "unregistered" or possibly registered to a Nissan, but not to the BMW. Id.

Neal exited the Shop and Go at 9:23 PM and walked toward the BMW. He was carrying a plastic bag. He was wearing a black jacket over a camouflage hoodie and tight, skinny jeans. BWC 0:35.

Officer Cooper asked Neal if the BMW was his, and Neal replied it was. Officer Cooper asked Neal about the temporary rear license tag that was not linked to the BMW, and Neal expressed surprise when confronted about the mismatch between the make of the car and the tag, mentioning that the car recently had been towed, seemingly as some kind of explanation about why the tag was not linked to

the BMW. Officer Cooper then commented that the BMW was illegally parked but said that was not his main concern. BWC 0:35–0:57.

Having learned that Neal owned the illegally parked, illegally tagged car, Officer Cooper questioned Neal further. First, he asked whether Neal had a gun and whether there was anyone else in the car. Neal said no. Then, Officer Cooper asked for Neal's identification. Neal responded that he did not have identification with him. Officer Cooper asked whether Neal was a valid driver, and Neal nodded yes. BWC 0:57–1:07.

Neal then voluntarily opened the passenger door of the BMW in an offertory way, muttering something like, "Here, let me show you [inaudible]." Officer Cooper asked him again, "You don't got your license or nothing in here, man?" Neal said no again, while Officer Novak and Detective Hartley used their flashlights to see through the heavily tinted windows of the BMW. Then, unprompted, Neal reiterated, "I don't got no gun or nothing on me," while lifting his jacket above his waist, but turning his back to Officer Cooper who then politely asked Neal again for some kind of identification. Neal said he could give his address and social security number, to which Officer Cooper responded, "Cool, that would be awesome." BWC 1:07–1:33.

Officer Cooper then noticed a large amount of cash sticking out of Neal's pocket, expressed surprise, and asked Neal if he "got paid in cash or something," to which Neal responded, "I got

4

a job." Neal then pulled a large wad of bills from his pocket, opening it and saying, "There's like $1,000 here." Officer Cooper asked where Neal worked, and Neal responded "UPS." Officer Cooper said, "Cool, cool, cool," and then asked Officer Novak to take Neal's name and social security number.

Then, Neal said, "You can search my car and all that." BWC 1:33-1:47. The officers accepted that offer. While Detective Hartley began the search, Officer Novak took Neal's identifying information and went to enter it into the computer in his police cruiser.

At that point, Neal began to make impatient comments about why he was being questioned, including that he had "only been there for five minutes," an apparent reference to the amount of time he had been illegally parked. The officers responded that Neal was being questioned because he was illegally parked and because the tag was linked to a car other than the BMW. Neal appeared slightly frustrated at what he apparently regarded was a minor reason for his detention. Officer Cooper remained calm and polite in his explanations, and Neal, ultimately, appeared to have understood the situation as well. Officer Cooper told Neal, "Look, we're not trying to write tickets bro, if everything's straight then it's straight, you know?" BWC 1:47-2:09.

The encounter continued for about ninety more seconds while Officer Cooper waited for the report about the identifying

information (address and social security number) that Neal had given to Officer Novak. During that time, Neal called his mother on his cell phone and thereafter stood casually, discussing the matter with Officer Cooper.

At 9:26 PM, about three minutes from the start of the encounter, Officer Novak returned to advise that Neal's driver's license was suspended. Neal acknowledged that he knew his license was suspended, thereby acknowledging that he had lied when he previously had said that he was a valid driver. Neal also offered that he had "a class to take" to have the license reinstated. Neal then became slightly more animated, pointing out that he was only a few houses or blocks from his home (in part, it seemed, to illustrate that he was not lying about his identifying information). When Officer Novak returned and confirmed Neal's residence, Neal sparked some recognition between him and Novak based on a previous encounter, laughing, and saying, "Come on man, you know me, you know who I am." BWC 3:58-4:12.[1]

Officer Cooper then asked for permission to search Neal for drugs. Neal responded by backing away slightly, opening his jacket, and saying that he did not have any other than a small baggie of

---

[1] Officer Novak revealed later in the encounter that he did know Neal and knew that he was a felon. BWC 7:41 ("He's a felon with a gun."). He also would have learned that Neal was a felon from running Neal's identifying information. However, at this earlier stage of the encounter, he did not communicate that knowledge to Officer Cooper.

6

marijuana which he handed to Officer Cooper, who laughed in response, saying he was not "even flexing on that." Officer Cooper again asked Neal if he could search his person. Neal continued to empty his pockets in an apparent effort to indicate that he was in possession of nothing illegal. At the same time, however, Neal began to turn the right side of his body away from Officer Cooper's view. BWC 4:12-4:28.

As that was occurring, Officer Cooper politely asked Neal, for a third time, for permission to search him. Neal responded, "For what though?" Officer Cooper said he was asking his permission because Neal had a lot of cash on his person, and they were in a "bad area." Neal protested against the suggestion that because he had a lot of cash on him, he should assent to a search, asking again what the search would be for. Officer Cooper said that it was for "his curiosity," and that he could not force the search on Neal. Neal said, "No, sir, no." BWC 4:28-5:00.

Although Officer Cooper relented and did not ask to search Neal again, Neal continued to explain himself. Again, he lifted his jacket and repeated that "he had nothing on him" except "the smoke," (i.e., the marijuana that he had previously given to Officer Cooper). While making this rather strange explanation, Neal dropped some items from his pockets and bent down to pick them up. BWC 5:00-5:15. When Neal stood back up, Officer Cooper

noticed a roughly six-inch, square-tipped bulge in Neal's pants front that Officer Cooper had not noticed before.

Officer Cooper thought that the bulge looked like a gun and so he asked Neal, "... Can I just pat you down?" On the front--it looks like you got...something right by, like, where your right arm is," gesturing towards the right front of Neal's pants. Neal took off his jacket, repeating, "I don't have nothing on me, sir." Officer Cooper again requested permission to do a pat-down. Neal repeated again that he did not have anything illegal on his person. Officer Cooper moved in and felt the front right area of Neal's pants. BWC 5:15-5:30.

Then, referring to what he perceived to be a gun-shaped bulge in Neal's right pants leg, Officer Cooper asked, "What is that right there?" Neal started to respond, "It's my--," as he made motions as if to turn away. At this point, the officers physically restrained Neal, with Officer Cooper repeating, "Stop, stop, stop, bro," as they brought the resisting Neal to the ground and handcuffed him. Officer Cooper declared "gun" (referring to the item causing the bulge in Neal's pants). BWC 5:31-6:00.

The entire encounter, from the first questioning of Neal to the time that Neal was placed into custody and the gun was retrieved from his pants lasted approximately five-and-a-half minutes. The encounter was non-confrontational until Officer Cooper pressed to pat-down Neal for what was thought to be a gun.

8

In support of the MOTION, Neal makes several arguments.

First, he contends that he was seized when he was questioned upon exiting the convenience store and when approaching the car.[2] And, says Neal, that seizure constituted a so-called "Terry" stop for which there was no reasonable articulable suspicion that Neal was engaged in criminal activity. Terry v. Ohio, 392 U.S. 1 (1968).

Neal's position on reasonable suspicion depends on his view of what constitutes the totality of the circumstances on which the Terry analysis should be made. In particular, Neal sees the totality as comprised of the fact that, when questioned upon approaching the car, he was cooperative and that his conduct (carrying a plastic bag from a convenience store) was not criminal activity. MOTION TO SUPPRESS EVIDENCE (ECF No. 17, pp. 5-6).[3] Neal does not include in the totality mix the fact that he admitted that the illegally parked, illegally tagged car was his, and he had driven it while his license was suspended, and that the area was a high crime area known for gun and drug crimes.

---

[2] MOTION TO SUPPRESS EVIDENCE (ECF No. 17, pp. 5-6).

[3] Neal's brief contains the statement that "once Novak ran his information and it was confirmed that he had no outstanding warrants for his arrest, there did not exist any separate reasonable articulable suspicion of criminal activity to continue the seizure. . . ." MOTION TO SUPPRESS EVIDENCE (ECF No. 17, p. 6). There is no authority cited for that statement. Nor is it at all developed.

Alternatively, Neal argues that, "even if the Court were to find that there was reasonable articulable suspicion to seize" him, Neal "was patted-down without reasonable articulable suspicion that he was armed and presently dangerous."[4] That theory is based upon a somewhat difficult to understand argument respecting whether the bulge that Officer Cooper observed in Neal's pants was sufficient to provide reasonable suspicion that he was armed and dangerous so as to warrant a pat-down. That theory seems to be that decisions in which reasonable suspicion findings have been sustained on the basis of a bulge thought to be a gun have been limited to circumstances in which an individual is lawfully stopped in a vehicle; that Neal was not so stopped; and that, therefore, the bulge cannot be the basis for reasonable suspicion. ECF No. 17, pp. 7-8.

In his reply brief, Neal raises for the first time an argument based upon the decision in Rodriguez v. United States, 575 U.S. 348 (2015). The argument is that:

> Should the Court find that there was probable cause or reasonable suspicion to seize Neal, the officers still violated Neal's Fourth Amendment rights when they extended the seizure into an investigation into firearm and narcotics activity absent separate reasonable articulable suspicion or probable cause.

---

[4] MOTION TO SUPPRESS EVIDENCE (ECF No. 17, pp. 6-8).

That argument, appearing as it does for the first time in the reply brief, need not be entertained. Nonetheless, because the truncated and unsupported argument described in footnote 3, _supra_, might have been intended to be a _Rodriguez_ argument, the developed _Rodriguez_ argument in the reply brief will be considered.

<strong>DISCUSSION</strong>

## I.   Legal Framework

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This amounts to a default rule that "law enforcement must obtain a warrant, grounded in probable cause, before seizing or searching individuals." _United States v. Harris_, No. 3:21-cr-18, 2021 WL 2384554, at *3 (E.D. Va. June 10, 2021) (citing _United States v. Yengel_, 711 F.3d 392, 396 (4th Cir. 2013)). "Where law enforcement seize or search an individual without a warrant and under circumstances in which no exception to the warrant requirement applies, the Fourth Amendment is violated, and the evidence found as a result of the violation must be suppressed." _Id._ (citing _Wong Sun v. United States_, 371 U.S. 471, 484-85 (1963)).

In the context of traffic stops, more specific rules come into play. It is settled that:

> Temporary detention of individuals during the
> stop of an automobile by the police, even if

11

> only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of [the Fourth Amendment]. An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. *As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.*

Whren v. United States, 517 U.S. 806, 810-11 (1996) (emphasis added); see also Delaware v. Prouse, 440 U.S. 648, 659 (1979); Pennsylvania v. Mimms, 434 U.S. 106, 109 (1997) (per curiam). "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). And, probable cause is determined by assessing the totality of the circumstances as viewed from the objective perspective of a reasonable officer. District of Columbia v. Wesby, 583 U.S. 48, 56-57 (2018).

But probable cause to effect a traffic stop is much different than justification for a pat-down frisk for weapons. Officers may briefly detain a suspect and conduct "a reasonable search for weapons for the protection of [that] police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. That is the standard of reasonable suspicion which is a "commonsensical

proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). That is because officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotations omitted).

The purpose of the pat-down is protective, meaning that the officer is looking for weapons that could harm him or others in the vicinity. Minnesota v. Dickerson, 508 U.S. 366, 373 (1993). The stop and the inquiry must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. And the reason for the pat-down must not only be reasonable but articulable and reasonably particular. "[T]he Fourth Amendment is not satisfied by a mere 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." United States v. Bumpers, 705 F.3d 168, 171 (4th Cir. 2013) (quoting Terry, 392 U.S. at 27)).

In sum, justification for a traffic stop and justification for a pat-down are two separate inquiries. A traffic stop must be based on "probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810. To conduct a pat-down for weapons, "the police must . . . have reasonable suspicion 'that

13

the persons with whom [they are] dealing *may be armed and presently dangerous*' in order *to justify* 'a carefully *limited search of the outer clothing* of such persons in an attempt to discover weapons.'" United States v. Braxton, 456 Fed. App'x 242, 245 (4th Cir. 2011) (emphasis added) (quoting Terry, 392 U.S. at 30) (emphasis added); Robinson, 846 F.3d at 698. "To be clear, the general risk that is inherent during a traffic stop does not, without more, justify a frisk of the automobile's occupants." Robinson, 846 F.3d at 699. But when a stopping officer reasonably suspects that the suspect is armed, the officer is "warranted in the belief that his safety . . . [is] in danger." Id.

Courts have held that traffic stops can be more dangerous than pedestrian stops. The reasoning has been based on the inherent danger in approaching a car whose contents and passengers are unknown. Compared to what could be located on the person of a pedestrian, a car, with potentially multiple people inside and with many places to conceal dangerous weapons, presents a more significant range of potential dangers. In Mimms, the Supreme Court "expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations," holding instead that car stops were, in fact, more dangerous. 434 U.S. at 110. In Wilson, the Supreme Court went a step further to hold also (after holding that Mimms extended to passengers) that the risk of a violent encounter in a traffic stop

14

"stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." 519 U.S. at 413-14. Therefore, drivers and passengers stopped in a car have a higher "motivation . . . to employ violence to prevent apprehension of such a crime." Id. The danger stems from "the inordinate risk confronting an officer as he approaches a person *seated in an automobile*." Mimms, 434 U.S. at 110 (emphasis added).

However, it would be a most serious mistake to think that in today's world, particularly in high crime areas where illegal guns abound (whether in support of drug trafficking or otherwise), law enforcement officers do not face significant risks of injury and even death from pedestrians carrying concealed weapons. Thus, there is every reason to apply Terry's principles to pedestrian stops. To do so affords reasonable protection to the rights of citizens and to the societal interest in assuring the safety of law enforcement officers as they do their jobs.

And, in fact, in the cases in which courts have discussed safety differences between vehicle stops and pedestrian stops, indicia of present dangerous, such as a gun-shaped bulge in the defendant's clothing, were analyzed for a pedestrian stop under the same standard as for a vehicle stop. See, e.g., Mimms, 434 U.S. at 112 (holding that "[t]he bulge in the jacket" of the driver *after he stepped out of the car* "permitted the officer to conclude

15

that Mimms was armed and thus posed a serious and present danger to the safety of the officer"); Robinson, 846 F.3d at 697 (upholding the denial of a motion to suppress because the defendant driver was *ordered from the car*, then when asked whether he had any weapons, the defendant "gave [the officer] . . . an 'oh, crap' look").

So, for either a traffic stop or a pedestrian stop, the requirements for a weapons pat-down, or "Terry frisk," must be satisfied. "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013). "[C]ourts must look at the 'totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting [that the detainee was armed and dangerous]." Arvizu, 534 U.S. at 273.

Factors that weigh in favor of a reasonable suspicion of danger include a bulge in clothing that suggests the presence of a gun, presence in a high-crime area, and furtive, concealing or unusual conduct. "Observing a bulge that could be a weapon in a suspect's clothing 'reasonably warrants a belief that the suspect is potentially dangerous.'" United States v. Scott, 250 Fed. App'x 534, 535 (4th Cir. 2007) (quoting United States v. Baker, 78 F.3d 135, 137 (4th Cir. 1996)). In Scott, a "bulge in the pants"

16

witnessed by an officer during a traffic stop, in a high crime area, when the defendant was "visibly shaking, sweating, and looking straight ahead without eye contact" was enough to give reasonable suspicion that the defendant was armed or otherwise dangerous. 250 Fed. App'x at 535–36. In Mimms, a bulge under the defendant's jacket alone, once he stepped out of the car, was sufficient to provide reasonable suspicion that he was armed. 434 U.S. at 111–12. In United States v. Black, 525 F.3d 359, 365–66 (4th Cir. 2008), the Court of Appeals found reasonable suspicion warranting a pat-down where the defendant was in a high crime area, furtively would not take his hand out of his pocket, and had what appeared to be a gun-shaped bulge in his pants.

Of course, though, "[i]t cannot be doubted that 'a refusal to cooperate [with a police request to conduct a voluntary search], without more, does not furnish the minimal level of objective justification needed for a *detention or seizure*.'" United States v. Massenburg, 654 F.3d 480, 490–91 (4th Cir. 2011) (emphasis added) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). And, too, "[i]f the ordinary response of the innocent upon being asked to consent to a *search*--some mild nervousness--sufficed to create reasonable suspicion, then Terry's reasonable suspicion requirement would become meaningless . . . . Virtually any denial will be accompanied by these mild reactions to the request, and thus virtually any denial would go much of the way toward

17

authorizing a nonconsensual search. This cannot be the case." <u>Id.</u> at 491 (emphasis added).

In sum, assuming that a traffic stop is reasonable (supported by probable cause) in the first place, a pat-down for weapons must be separately reasonable, based on a reasonable, articulable, and particularized suspicion that the suspect is armed and therefore dangerous, and not based on the refusal of the suspect to consent to a search. Viewing a bulge that appears to be a concealed gun can provide that reasonable suspicion, especially when paired with furtive concealment, unusual behavior, and presence in a high crime area at night.

## II.  Analysis

### a.  The Initial Stop

Here, the first two questions are whether the initial stop of Neal as he exited the convenience store and approached the BMW was a seizure, and if so, whether it was reasonable. The answer to both is yes.

The first statement that Neal made (during what was a consensual encounter) was that the illegally parked and illegally tagged BMW was his. At that point, as the Government conceded in the briefs and at oral argument, the encounter turned into a traffic stop, a seizure to which the Fourth Amendment requirements attached. The seizure of Neal occurred because he had illegally parked the BMW that he was driving, and because the car he claimed

to be his bore only one license plate, a condition prohibited by Virginia law. Although Neal was not in it when the officers stopped to investigate the illegally parked, inadequately tagged car, he came out of the store while the officers were investigating the traffic infractions and acknowledged that the BMW was his. In so doing, he gave the officers a reasonable basis to attribute the traffic violations to him.

The seizure of Neal under those facts was reasonable because there was probable cause that Neal had broken several traffic laws (e.g., illegally parking the BMW, leaving a vehicle unattended, parking within twenty feet of an intersection, and failing to keep correct, legitimate, and properly mounted license plates). Under Whren and its progeny, so long as there exists probable cause that a traffic infraction has occurred, a brief seizure, in the form of a traffic stop, to investigate those infractions is reasonable. See 517 U.S. at 813.

Although the probable cause justifying the seizure was traffic related, it is true that Neal was not in the car when the seizure began. So, in that respect, this case differs somewhat from Whren. But the purpose of Neal's detention was to investigate the traffic infractions he had committed by illegally parking the BMW and by driving it without the requisite front tag. Therefore, even though Neal was not actually driving the car when the seizure

19

commenced, this was a traffic stop for which there was probable cause.

   **b.   The Pat-Down**

   The next issue is whether the pat-down was authorized. As explained above, it is settled that a pat-down must be supported by a reasonable, articulable belief that the suspect is armed and thus dangerous. So now, the analysis turns to whether there existed separate, reasonable suspicion to believe that Neal was armed. Considering the totality of the circumstances, it was objectively reasonable to believe that Neal was armed. In other words, there was reasonable, articulable, and particularized support for the suspicion that Neal was armed and dangerous, thereby satisfying the requirements of <u>Terry</u>.

   The encounter occurred in a high crime area at night. The area was known for drug and gun crimes. Also, Neal had violated traffic laws, including being illegally parked, driving on a suspended license, driving a car without a front license plate as required by Virginia law, and driving a car that did not match the only tag that was on it.  By the time that the pat-down occurred, the totality of the known circumstances included the fact that Neal had been driving while his license was suspended (a fact about which Neal had lied). That conduct and those facts evinced a person who was willing to break the law and who, just recently, had done so in several ways.

Added to the totality mix was the fact that, while the traffic stop was under way, Officer Cooper noticed a bulge in an area below the pocket on the right leg of Neal's pants that, according to Officer Cooper's experience and training, was shaped liked a gun. And, the totality of circumstances also includes the fact that, at the time, Neal was trying to conceal the bulge from Officer Cooper by turning that side of his body away from Officer Cooper's line of sight and by holding his arm and shopping bag over the bulge. And, all the while, Neal was acting strangely by talking fast and repeatedly lifting his clothing. Combinations of factors similar to these were sufficient to warrant a pat-down in cases such as Black, 525 F.3d at 365-66, and Mimms, 434 U.S. at 112. Here, the totality of circumstances was certainly sufficient to conclude that the pat-down of Neal was constitutionally acceptable.

It is true that, because Neal was encountered on foot, he conceivably was less dangerous than a driver seated in a car (of which the contents and passengers are unknown) being approached by a vulnerable officer from behind.[5] But, that difference is of no legal consequence. As the Government pointed out, the drivers in Mimms and Robinson were outside the car by the time they were patted-down. And, at any rate, just because a driver is initially encountered outside the car does not mean that he is any less

---

[5] Those were the circumstances addressed by the Supreme Court in Mimms and Wilson and our Court of Appeals in Robinson.

21

likely to be armed and dangerous if the totality of the circumstances reasonably warrants the belief that he is. It only means that the officers would have been more likely justified in taking additional precautions, had they taken them, if they had approached Neal whilst in the driver's seat.

Neal makes much of the fact that the pat-down occurred toward the end of the detention and shortly after Neal had refused to allow Cooper to search his person. And, to that, Neal adds that, for most of the encounter, he was cooperative and did not attempt to conceal anything. These two things (that the pat-down occurred toward the end of the encounter and that Neal was cooperative), says Neal, show that there was no basis for Officer Cooper to be concerned for the safety of the officers on the scene. And, of course, pat-downs under <u>Terry</u> are for officer safety, <u>see</u> <u>Dickerson</u>, 508 U.S. at 373, so one that occurs toward the end of a police encounter with a cooperative detainee should be scrutinized with those facts in mind. It is also true that refusal to be searched cannot give reasonable suspicion for a pat-down.

The requirement for a lawful pat-down is that, "*during* the valid but forced encounter, the officer reasonably suspect that the person is armed and therefore dangerous." <u>Robinson</u>, 846 F.3d at 700 (emphasis added). If reasonable suspicion appears during the stop, while the stop is still underway, as here, it nonetheless justifies a pat-down of the outer clothing for weapons. Here, the

22

record shows that the circumstances evolved during the encounter. In particular, as the encounter evolved, Officer Cooper learned that Neal's license to drive was suspended (a fact about which Neal had lied) and that he had unlawfully driven and unlawfully parked an unlawfully tagged car he claimed to be his. More importantly, Officer Cooper noticed the gun shaped bulge only after Neal refused the search. Officer Cooper testified at the hearing that he noticed the bulge because, after Neal bent over to pick up items he had dropped on the ground, after refusing to consent to the search, the bulge appeared to have dislodged itself from Neal's waistband and to have slid down the leg of his pants. And, while acting strangely, Neal continued furtively to conceal the bulge in his right pants leg by placing his right hand and the bag over it and by turning that side of his body away from Officer Cooper's line of sight.

Neal's efforts to conceal the bulge, and Officer Cooper's ability to see the contours of the bulge, prompted Officer Cooper, during the legitimate stop, to conclude that Neal, who had evinced a disregard of the law by committing several traffic violations, who was acting strangely, who had lied about the status of his driver's license, who was encountered in a high crime area (known for gun and drug crimes) could be armed and dangerous. Officer Cooper would have acted irresponsibly had he ignored this potential threat to his safety and that of his fellow officers, as well as

23

to the safety of members of the public in the vicinity (the BWC showed several observers in the area).[6]

### c.   The Rodriguez Argument

That leaves for resolution Neal's belatedly pressed argument based on the decision in Rodriguez v. United States, 575 U.S. 348 (2015). Although it is not necessary to address Neal's belated Rodriguez argument, prudence suggests that it is appropriate to do so to avoid the inefficiency that would result if, on appeal, failure to address it were to be found erroneous. So to that contention, the analysis now turns.

In 2010, our Court of Appeals held that "[t]here is no support in Fourth Amendment jurisprudence for the notion that questioning unrelated to the purpose of a traffic stop requires reasonable suspicion, provided that the questioning occurs within the timeframe reasonably necessary to effectuate the traffic stop." United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010). In 2015, the Supreme Court tightened that principle somewhat in Rodriguez.

There, the defendant was stopped for a minor traffic infraction. During the stop, the officer gathered the defendant's license, registration, and proof of insurance, ran a records check, and issued the defendant a citation. 575 U.S. at 352. The officer

---

[6] All of these facts, known to Officer Cooper, warrant an objective officer to reasonably conclude that Neal could be, indeed might well be, armed and dangerous.

in <u>Rodriguez</u> testified that, before the drug dog was activated, "[he] got all the reason[s] for the stop out of the way[,] . . . took care of all the business." <u>Id.</u> Having attended fully to the reason for the reasonable traffic stop, the officer next asked the defendant for permission to walk his dog around the car for a sniff search. The defendant refused, which prompted the officer to instruct the defendant to exit the vehicle, shut off the ignition, and wait, while the officer performed a search anyway, extending the stop by about seven to eight minutes. The search revealed drugs. <u>Id.</u>

When reviewing the motion to suppress the evidence of the seized drugs, the magistrate judge found that there was no independent probable cause or reasonable suspicion justifying the search. However, the magistrate judge nonetheless recommended denying the motion, because a seven-to-eight-minute delay after the traffic stop was concluded was a *de minimis* extension of what was a valid traffic stop, citing the Eighth Circuit's decision in <u>United States v. Alexander</u>, 448 F.3d 1014, 1016 (8th Cir. 2006). <u>Rodriguez</u>, 575 U.S. at 352-53. The district court denied the motion and the Eighth Circuit affirmed. <u>Id.</u> at 353.

The Supreme Court reversed, holding that traffic stops that transcend into criminal investigations without separate justification violate the Fourth Amendment, because "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction

are--or reasonably should have been--completed." Rodriguez, 575 U.S. at 354. And, "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Id. at 355 (quoting Arizona v. Johnson, 555 U.S. at 333). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop." Id. But, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. Therefore, pursuant to Rodriguez, when police complete everything necessary for a traffic-related stop, separate probable cause or reasonable suspicion must exist for separate law enforcement activity to be constitutionally permissible.

Rodriguez does not move the needle in this case. Unlike in Rodriguez, where everything necessary pursuant to the traffic stop was complete, here, when Officer Cooper requested permission to search Neal, and then shortly thereafter (unrelatedly) patted him down, the traffic stop (which was supported by probable cause) was still very much in progress. During the brief span of the stop, Officer Novak had discovered that Neal's license was suspended, meaning both that Neal had driven to the location in violation of the law and that he could not move the BMW from where it was illegally parked. And, the car could not just be left in the allegedly parked location (a traffic lane of a busy road). It either had to be handed over to a licensed driver or towed to an

26

impound lot.  Furthermore, the issue of the erroneous temporary license tag had not been resolved yet, either. So, the identity of the owner was still unconfirmed.  Officer Cooper's brief questioning and the pat-down took place within the confines of the initial traffic stop. This is clearly different from Rodriguez, where the officer testified that everything necessary pursuant to the stop was complete when he began the separate search.

Furthermore, Rodriguez dealt with a search for drugs. And the officer there commenced the search after the defendant had refused to give permission for the search. Here, after Neal refused a search of his person for drugs, no search occurred (until after Neal was arrested for the separate reason of the gun). Since no search occurred, the question here is whether: (1) Officer Cooper's mere requesting permission to search, or (2) Officer Cooper's subsequent, unrelated pat-down of Neal, "measurably extend[ed] the duration of the stop." Rodriguez, 575 U.S. at 355.

Neal argues that, when Cooper asked him if he had any drugs or weapons on him during the stop, the stop turned into a criminal investigation, which would require separate justification following Rodriguez. But "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop," as long as he "do[es] not do so in a way that prolongs the stop . . . ." Id. It simply cannot be said that by: (1) asking Neal two or three times (over the course of about fifteen seconds) if he could search

27

Neal for drugs; (2) declining to search him when Neal refused the search (all while the suspended license and bad license plate issues were unresolved); and (3) then patting Neal down for officer safety after Officer Cooper noticed a gun shaped bulge in Neal's pants, Officer Cooper unlawfully prolonged the stop thereby turning it into a criminal investigation requiring separate, additional justification.

### CONCLUSION

For the foregoing reasons,[7] Neal's MOTION TO SUPPRESS EVIDENCE (ECF No. 17) will be denied.

It is so ORDERED.

_____  /s/  REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 19, 2024

---

[7] Having found that both the initial seizure of Neal and the pat-down of his outer clothing were reasonable, Terry's fruit of the poisonous tree argument respecting the statements he made after the gun was found, and the Government's separate argument against the exclusionary rule in general, need not be addressed.